**Kevin ROSS, Plaintiff–Appellant,**

v.

**CREIGHTON UNIVERSITY, Defendant–Appellee.**

No. 90–2509.

United States Court of Appeals, Seventh Circuit.

Argued March 6, 1991.

Decided March 2, 1992.

---

Marty J. Schwartz (argued), Louis S. Goldstein, Cindy G. Fluxgold, Bruce S. Kreisman, and Michael A. Kaczmark, Goldstein & Fluxgold, Chicago, Ill., for plaintiff-appellant.

Lynn D. Dowd (argued), D. Patterson Gloor, Cassiday, Schade & Gloor, Chicago, Ill., for defendant-appellee.

Before RIPPLE and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Kevin Ross filed suit against Creighton University (Creighton or the University) for negligence and breach of contract arising from Creighton's alleged failure to educate him. The district court dismissed Mr. Ross' complaint for failure to state a claim. For the following reasons we affirm in part and reverse in part the judgment of the district court.

## I

## BACKGROUND

A. *Facts*

■ When reviewing the grant of a motion to dismiss, we assume the truth of all well-pleaded factual allegations and make all reasonable inferences in favor of the plaintiff. *Webster v. New Lenox School Dist. No. 122*, 917 F.2d 1004, 1005 (7th Cir.1990). Mr. Ross' complaint reveals the following story.

In the spring of 1978, Mr. Ross was a promising senior basketball player at Wyandotte High School in Kansas City, Kansas. Sometime during his senior year in high school, he accepted an athletic scholarship to attend Creighton and to play on its varsity basketball team.

Creighton is an academically superior university. Mr. Ross comes from an academically disadvantaged background. At the time of his enrollment at Creighton, Mr. Ross was at an academic level far below that of the average Creighton student. For example, he scored in the bottom fifth percentile of college-bound seniors taking the American College Test, while the average freshman admitted to Creighton with him scored in the upper twenty-seven percent. According to the complaint, Creighton realized Mr. Ross' academic limitations when it admitted him, and, to induce him to attend and play basketball, Creighton assured Mr. Ross that he would receive sufficient tutoring so that he "would receive a meaningful education while at CREIGHTON." R.44 at Count I, ¶ 10.

Mr. Ross attended Creighton from 1978 until 1982. During that time he maintained a D average and acquired 96 of the 128 credits needed to graduate. However, many of these credits were in courses such as Marksmanship and Theory of Basketball, and did not count towards a university degree. Mr. Ross alleges that he took these courses on the advice of Creighton's Athletic Department, and that the department also employed a secretary to read his assignments and prepare and type his papers. Mr. Ross also asserts that Creighton failed to provide him with sufficient and competent tutoring that it had promised.

When he left Creighton, Mr. Ross had the overall language skills of a fourth grader and the reading skills of a seventh grader. Consequently, Mr. Ross enrolled, at Creighton's expense, for a year of remedial education at the Westside Preparatory School in Chicago. At Westside, Mr. Ross attended classes with grade school children. He later entered Roosevelt University in Chicago, but was forced to withdraw because of a lack of funds. In July 1987, Mr. Ross suffered what he terms a "major depressive episode," during which he barricaded himself in a Chicago motel room and threw furniture out the window. R.44 at Count I, ¶ 26. To Mr. Ross, this furniture "symbolized" Creighton employees who had wronged him. *Id.*

## B. *District Court Proceedings*

Mr. Ross filed suit against Creighton in Cook County (Illinois) Circuit Court for negligence and breach of contract. Creighton, which is located in Omaha, Nebraska, removed the case to federal court on diversity grounds, pursuant to 28 U.S.C. §§ 1332 and 1441.

Mr. Ross' complaint advances three separate theories of how Creighton was negligent towards him. First, he contends that Creighton committed "educational malpractice" by not providing him with a meaningful education and preparing him for employment after college. Second, Mr. Ross claims that Creighton negligently inflicted emotional distress upon him by enrolling him in a stressful university environment for which he was not prepared, and then by failing to provide remedial programs that would have helped him survive there. Third, Mr. Ross urges the court to adopt a new cause of action for the tort of "negligent admission," which would allow recovery when an institution admits, and then does not adequately assist, a woefully unprepared student. The complaint also sets forth a contract claim, alleging that Creighton contracted to provide Mr. Ross "an opportunity ... to obtain a meaningful college education and degree, and to do what was reasonably necessary ... to enable [Mr. Ross] to obtain a meaningful college education and degree." R.44 at Count III, ¶ 24. It goes on to assert that Creighton breached this contract by failing to provide Mr. Ross adequate tutoring; by not requiring Mr. Ross to attend tutoring sessions; by not allowing him to "red-shirt," that is, to forego a year of basketball, in order to work on academics; and by failing to afford Mr. Ross a reasonable opportunity to take advantage of tutoring services. Mr. Ross also alleges that Creighton breached a promise it had made to him to pay for a college education.

Creighton moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), and the district court granted this motion. *Ross v. Creighton Univ.*, 740 F.Supp. 1319 (N.D.Ill.1990).[1] With regard to the negligence claims, the court held that the first of Mr. Ross' negligence theories—educational malpractice—would not be allowed by the Illinois Supreme Court if it faced such a claim as a matter of first impression. *Id.* at 1329. Characterizing this theory as one "beloved of commentators, but not of courts," the court reasoned that the difficulties in determining causa-

---

1. Creighton also moved for dismissal under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. The district court rejected this argument, holding that even though Creighton was a Nebraska institution, sufficient minimum contacts existed between it and the forum state of Illinois to satisfy the requirements of the Illinois Long–Arm Statute and the Fourteenth Amendment to the Constitution. *Ross v. Creighton Univ.*, 740 F.Supp. 1319, 1326 (N.D.Ill.1990).

tion and the duty owed, the intensely collaborative nature of education, and the possibility of a deluge of educational malpractice claims would compel Illinois to reject this cause of action. *Id.* at 1327–29. The court also held that a claim for negligent infliction of emotional distress exists in Illinois only if the plaintiff was physically harmed by the negligent act, within the "zone of danger" of physical harm, or the victim of a traditional tort such as medical malpractice. Since Mr. Ross' claim did not fit any of these categories, the court denied his claim on that theory. *Id.* at 1329–30. Finally, the court held that Illinois would refuse on policy grounds to permit Mr. Ross' newly fashioned claim for negligent admission to Creighton. The court reasoned that allowing this cause of action would unduly burden universities and also endanger the college prospects of many marginal students by requiring schools to factor into their admissions decisions the costs of tort damages resulting from a negligent admission. *Id.* at 1330.

With regard to the contract claims, the court recognized that the relationship between a student and a university is at least partly contractual. *Id.* at 1330–31 (citing *Carr v. St. John's Univ.*, 17 A.D.2d 632, 231 N.Y.S.2d 410 (App.Div.), *aff'd without opinion*, 12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962)). However, the court concluded that a breach of contract action could be maintained only for the breach of a specific contractual promise that did not require the court to assess the general quality of the education. *Id.* at 1331. In the district court's view, none of Mr. Ross' allegations met these criteria. Consequently, the contractual counts were dismissed.

## II

## ANALYSIS

### A. *Guiding Principles*

 As an appellate court, we review de novo a Rule 12(b)(6) dismissal for failure to state a claim. *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1326 (7th Cir.1990). "A party fails to state a claim upon which relief may be granted only if that party 'can prove no set of facts upon which relief may be granted.'" *Id.* (quoting *First Interstate Bank of Nevada v. Chapman & Cutler*, 837 F.2d 775, 776 (7th Cir.1988)). In this diversity case, because neither party raises an issue as to what state's law to apply, we apply the substantive law of Illinois, the forum state. *Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991). Our task, therefore, is to analyze Mr. Ross' complaint against the backdrop of Illinois law to determine if it states a claim. "'The decision of a federal court in a ... case in which state law provides the rule of decision, is an exercise in predicting how the highest court of the state would decide the case if it were presented to it.'" *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1298 (7th Cir.1991) (quoting *Konradi v. United States*, 919 F.2d 1207, 1213 (7th Cir.1990)). If no state statute or precedent directly controls the issue, it is our duty to determine how the case would be decided if presented today to the Supreme Court of Illinois. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967); *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 205, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956); *see also Brooks v. Chicago Downs Ass'n*, 791 F.2d 512, 514 (7th Cir.1986) ("Because the Illinois Supreme Court has never directly confronted the issue ... we must take what they have said, what Illinois appellate courts have said, and then the decisions of other states on the same issue, in order to formulate our holding."). *Cooper v. American Airlines, Inc.*, 149 F.2d 355, 359 (2d Cir.1945) (Frank, J.) ("What would be the decision of reasonable intelligent lawyers, sitting as judges of the highest New York court, and fully conversant with New York 'jurisprudence'?"). We must make this determination de novo. *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190 (1991).

### B. *The Negligence Claims*

Mr. Ross advances three separate theories of how Creighton was negligent towards him: educational malpractice for not educating him, a new tort of "negligent

admission" to an educational institution, and negligent infliction of emotional distress. We believe that, on the facts of this case, Illinois law would deny Mr. Ross recovery on all three theories.

### 1. Educational malpractice

■ Illinois courts have never ruled on whether a tort cause of action exists against an institution for educational malpractice. However, the overwhelming majority of states that have considered this type of claim have rejected it.[2] Only Montana allows these claims to go forward, and its decision was based on state statutes that place a duty of care on educators, a circumstance not present here. *B.M. v. State*, 200 Mont. 58, 649 P.2d 425, 427–28 (1982).

Courts have identified several policy concerns that counsel against allowing claims for educational malpractice. First, there is the lack of a satisfactory standard of care by which to evaluate an educator. *Smith v. Alameda County Social Servs. Agency*, 90 Cal.App.3d 929, 153 Cal.Rptr. 712, 719 (1979). Theories of education are not uniform, and "different but acceptable scientific methods of academic training [make] it unfeasible to formulate a standard by which to judge the conduct of those delivering the services." *Swidryk v. St. Michael's Medical Center*, 201 N.J.Super. 601, 493 A.2d 641, 643 (Law Div.1985) (citing *Peter W. v. San Francisco Unified School Dist.*, 60 Cal.App.3d 814, 131 Cal. Rptr. 854, 859 (1976)). Second, inherent uncertainties exist in this type of case about the cause and nature of damages.

*Helm v. Professional Children's School*, 103 Misc.2d 1053, 431 N.Y.S.2d 246, 246–47 (App.Term 1980). "Factors such as the student's attitude, motivation, temperament, past experience and home environment may all play an essential and immeasurable role in learning." *Donohue v. Copiague Union Free School Dist.*, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352, 1355 (1979) (Wachtler, J., concurring). Consequently, it may be a "practical impossibility [to] prov[e] that the alleged malpractice of the teacher proximately caused the learning deficiency of the plaintiff student." *Id.* A third reason for denying this cause of action is the potential it presents for a flood of litigation against schools. *Moore v. Vanderloo*, 386 N.W.2d 108, 114–15 (Iowa 1986). As the district court noted, "education is a service rendered on an immensely greater scale than other professional services." *Ross v. Creighton Univ.*, 740 F.Supp. 1319, 1329 (N.D.Ill.1990). The sheer number of claims that could arise if this cause of action were allowed might overburden schools. *Id.* This consideration also suggests that a common-law tort remedy may not be the best way to deal with the problem of inadequate education. *Id.* A final reason courts have cited for denying this cause of action is that it threatens to embroil the courts into overseeing the day-to-day operations of schools. *Donohue*, 418 N.Y.S.2d at 444–45, 391 N.E.2d at 1354; *Hoffman v. Board of Educ.*, 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317, 320 (1979). *Hunter v. Board of Educ.*, 292 Md. 481, 439 A.2d 582,

---

**2.** Courts in at least eleven states have considered and rejected claims for educational malpractice: Alabama, Alaska, California, Florida, Idaho, Iowa, Kentucky, Maryland, New Jersey, New York, and Wisconsin. *See, e.g., Blane v. Alabama Commercial College, Inc.*, 585 So.2d 866 (Ala.1991); *D.S.W. v. Fairbanks North Star Borough School Dist.*, 628 P.2d 554 (Alaska 1981); *Peter W. v. San Francisco Unified School Dist.*, 60 Cal.App.3d 814, 131 Cal.Rptr. 854 (1976); *Smith v. Alameda County Social Servs. Agency*, 90 Cal.App.3d 929, 153 Cal.Rptr. 712 (1979); *Tubell v. Dade County Public Schools*, 419 So.2d 388 (Fla.Dist.Ct.App.1982); *Wickstrom v. North Idaho College*, 111 Idaho 450, 725 P.2d 155 (1986); *Moore v. Vanderloo*, 386 N.W.2d 108 (Iowa 1986); *Rich v. Kentucky*

*Country Day, Inc.*, 793 S.W.2d 832 (Ky.Ct.App. 1990); *Hunter v. Board of Educ.*, 439 A.2d 582 (Md.1982); *Swidryk v. St. Michael's Medical Center*, 201 N.J.Super. 601, 493 A.2d 641 (Law Div.1985); *Donohue v. Copiague Union Free School Dist.*, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979); *Hoffman v. Board of Educ.*, 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979); *Helm v. Professional Children's School*, 103 Misc.2d 1053, 431 N.Y.S.2d 246 (App.Term 1980); *Wilson v. Continental Ins. Cos.*, 87 Wis.2d 310, 274 N.W.2d 679 (1979). *See also* Joel E. Smith, Annotation, *Tort Liability of Public Schools and Institutions of Higher Learning for Educational Malpractice*, 1 A.L.R.4th 1133 (1980).

585 (1982). This oversight might be particularly troubling in the university setting where it necessarily implicates considerations of academic freedom and autonomy. *Moore*, 386 N.W.2d at 115.

We believe that the Illinois Supreme Court would find the experience of other jurisdictions persuasive and, consequently, that these policy considerations are compelling. Consequently, the Illinois Supreme Court would refuse to recognize the tort of educational malpractice. We therefore affirm the district court's dismissal of Mr. Ross' claim based on that theory.

2. "Negligent admission"

■ In his complaint, Mr. Ross alleges that Creighton owed him a duty "to recruit and enroll only those students reasonably qualified and able to academically perform at CREIGHTON." R.44 at Count I, ¶ 24. He then contends that Creighton breached this duty by admitting him, not informing him of how unprepared he was for studies there, and then not providing tutoring services or otherwise enabling him to receive a meaningful education. As a result, Mr. Ross underwent undue stress, which brought about, among other things, the incident at the motel.

We believe that Illinois would reject this claim for "negligent admission" for many of the same policy reasons that counsel against recognizing a claim for educational malpractice. First, this cause of action would present difficult, if not insuperable, problems to a court attempting to define a workable duty of care. *See Peter W.*, 131 Cal.Rptr. at 859; *Smith v. Alameda County Social Servs. Agency*, 153 Cal.Rptr. at 719. Mr. Ross suggests that the University has a duty to admit only students who are "reasonably qualified" and able to perform academically. However, determining who is a "reasonably qualified student" necessarily requires subjective assessments of such things as the nature and quality of the defendant institution and the intelligence and educability of the plaintiff. Such decisions are not open to ready determination in the judicial process. Second, such a cause of action might unduly interfere with a university's admissions decisions, to the detriment of students and society as a whole. *Ross*, 740 F.Supp. at 1330. As the district court noted, if universities and colleges faced tort liability for admitting an unprepared student, schools would be encouraged to admit only those students who were certain to succeed in the institution. The opportunities of marginal students to receive an education therefore would likely be lessened. *Id.* Also, the academic practice of promoting diversity by admitting students from disadvantaged backgrounds might also be jeopardized. *See Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 311–15, 98 S.Ct. 2733, 2759–61, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.) (discussing the importance of diversity in the university setting).

3. Negligent infliction of emotional distress

■ Finally, Mr. Ross argues that his allegations that Creighton wrongfully admitted him, and then caused him emotional harm, present a claim under the traditional tort theory of negligent infliction of emotional distress. In *Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill.Dec. 489, 493, 574 N.E.2d 602, 606 (1991), the Illinois Supreme Court made clear that the "essential question" when evaluating whether a complaint states a claim for negligent infliction of emotional distress "is whether the plaintiff properly alleged negligence on the part of the defendant." We have already held that policy reasons would compel Illinois not to recognize Mr. Ross' claims for educational malpractice and negligent admission. We believe that these same concerns would cause it to refuse to recognize in this situation a claim for negligent infliction of emotional distress.

C. *The Contract Claims*

■ In counts two and three of his complaint, Mr. Ross alleges that Creighton breached an oral or a written contract that it had with him. When read as a totality, these allegations fairly allege that Creighton agreed, in exchange for Mr. Ross' promise to play on its basketball team, to

allow him an opportunity to participate, in a meaningful way, in the academic program of the University despite his deficient academic background. The complaint further alleges, when read as a totality, that Creighton breached this contract and denied Mr. Ross any real opportunity to participate in and benefit from the University's academic program when it failed to perform five commitments made to Ross: (1) "to provide adequate and competent tutoring services," (2) "to require [Mr. Ross] to attend tutoring sessions," (3) to afford Mr. Ross "a reasonable opportunity to take full advantage of tutoring services," (4) to allow Mr. Ross to red-shirt, and (5) to provide funds to allow Mr. Ross to complete his college education. R.44 at Count II, ¶¶ 28 and 31, and Count III at ¶¶ 26 and 29.

It is held generally in the United States that the "basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract." *Zumbrun v. University of Southern California*, 25 Cal.App.3d 1, 101 Cal.Rptr. 499, 504 (1972) (collecting cases from numerous states). Indeed, there seems to be "no dissent" from this proposition. *Wickstrom v. North Idaho College*, 111 Idaho 450, 452, 725 P.2d 155, 157 (1986) (quoting *Peretti v. Montana*, 464 F.Supp. 784, 786 (D.Mont. 1979), *rev'd on other grounds*, 661 F.2d 756 (9th Cir.1981)). As the district court correctly noted, Illinois recognizes that the relationship between a student and an educational institution is, in some of its aspects, contractual. *See Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977) (agreement that medical school application would be evaluated according to the criteria described by the medical school in its literature); *DeMarco v. University of Health Sciences*, 40 Ill.App.3d 474, 352 N.E.2d 356 (1976) (refusal to award M.D. degree for reasons

unrelated to academic qualifications constitutes breach of contract).[3] It is quite clear, however, that Illinois would not recognize all aspects of a university-student relationship as subject to remedy through a contract action. *DeMarco* makes the point quite clearly. "A contract between a private institution and a student confers duties upon both parties which cannot be arbitrarily disregarded and may be judicially enforced." *DeMarco*, 352 N.E.2d at 361–62. However, "a decision of the school authorities relating to the academic qualification of the students will not be reviewed.... [C]ourts are not qualified to pass an opinion as to the attainments of a student ... and ... courts will not review a decision of the school authorities relating to academic qualifications of the students." *Id.*

There is no question, we believe, that Illinois would adhere to the great weight of authority and bar any attempt to repackage an educational malpractice claim as a contract claim. As several courts have noted, the policy concerns that preclude a cause of action for educational malpractice apply with equal force to bar a breach of contract claim attacking the general quality of an education. *Wickstrom*, 725 P.2d at 157 n. 1; *Hunter v. Board of Educ.*, 292 Md. 481, 439 A.2d 582, 586 n. 5 (1982); *Torres v. Little Flower Children's Servs.*, 64 N.Y.2d 119, 485 N.Y.S.2d 15, 474 N.E.2d 223, 227 (1984), *cert. denied*, 474 U.S. 864, 106 S.Ct. 181, 88 L.Ed.2d 150 (1985). "Where the essence of the complaint is that the school breached its agreement by failing to provide an effective education, the court is again asked to evaluate the course of instruction ... [and] is similarly called upon to review the soundness of the method of teaching that has been adopted by an educational institution." *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 454 N.Y.S.2d 868, 872 (1982).

To state a claim for breach of contract, the plaintiff must do more than simply

---

**3.** For further discussion of the contractual nature of the relationship between student and institution *see Zumbrun v. University of Southern California*, 25 Cal.App.3d 1, 101 Cal.Rptr. 499 (1972); *Wickstrom v. North Idaho College*,

111 Idaho 450, 725 P.2d 155 (1986); *Taylor v. Wake Forest Univ.*, 16 N.C.App. 117, 191 S.E.2d 379, *cert. denied*, 282 N.C. 307, 192 S.E.2d 197 (1972); *Ward v. Washington State Univ.*, 39 Wash.App. 630, 695 P.2d 133 (1985).

allege that the education was not good enough. Instead, he must point to an identifiable contractual promise that the defendant failed to honor. Thus, as was suggested in *Paladino,* if the defendant took tuition money and then provided no education, or alternately, promised a set number of hours of instruction and then failed to deliver, a breach of contract action may be available. *Paladino,* 454 N.Y.S.2d at 873; *see also Zumbrun,* 101 Cal.Rptr. 499 (breach of contract action allowed against university when professor declined to give lectures and final exam, and all students received a grade of "B"). Similarly, a breach of contract action might exist if a student enrolled in a course explicitly promising instruction that would qualify him as a journeyman, but in which the fundamentals necessary to attain that skill were not even presented. *See Wickstrom,* 725 P.2d at 156–58. In these cases, the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all. Ruling on this issue would not require an inquiry into the nuances of educational processes and theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise.

We read Mr. Ross' complaint to allege more than a failure of the University to provide him with an education of a certain quality. Rather, he alleges that the University knew that he was not qualified academically to participate in its curriculum. Nevertheless, it made a specific promise that he would be able to participate in a meaningful way in that program because it would provide certain specific services to him. Finally, he alleges that the University breached its promise by reneging on its commitment to provide those services and, consequently, effectively cutting him off from *any* participation in and benefit from the University's academic program. To adjudicate such a claim, the court would not be required to determine whether Creighton had breached its contract with Mr. Ross by providing *deficient* academic services. Rather, its inquiry would be limited to whether the University had provided any real access to its academic curriculum at all.

Accordingly, we must disagree respectfully with our colleague in the district court as to whether the contract counts of the complaint can be dismissed at the pleadings stage. In our view, the allegations of the complaint are sufficient to warrant further proceedings. We emphasize, however, the narrow ground of our disagreement. We agree—indeed we emphasize—that courts should not "take on the job of supervising the relationship between colleges and student-athletes or creating in effect a new relationship between them." *Ross,* 740 F.Supp. at 1332. We also recognize a formal university-student contract is rarely employed and, consequently, "the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific terms by implication." *Wickstrom,* 725 P.2d at 157 (quoting *Peretti,* 464 F.Supp. at 786). Nevertheless, we believe that the district court can adjudicate Mr. Ross' specific and narrow claim that he was barred from *any* participation in and benefit from the University's academic program without second-guessing the professional judgment of the University faculty on academic matters.

### Conclusion

Accordingly, the judgment of the district court is affirmed in part and reversed and remanded in part for proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part and REMANDED.