578 S.E.2d 711

**R.J. HENDRICKS, II, Respondent,**

v.

**CLEMSON UNIVERSITY, Petitioner.**

No. 25606.

Supreme Court of South Carolina.

Heard Sept. 18, 2002.

Decided March 17, 2003.

---

Jack D. Griffeth and Amy G. Richmond, both of Love, Thornton, Arnold & Thomason, of Greenville, for petitioner.

Scott M. Anderson, of Anderson Law Firm, P.A., of Greenville, for respondent.

Chief Justice TOAL:

Petitioner, Clemson University ("Clemson"), appeals from the Court of Appeals' reversal of summary judgment for Clemson.

### FACTUAL/PROCEDURAL BACKGROUND

Respondent, R.J. Hendricks, II ("Hendricks") was recruited out of high school by several colleges to play baseball. He received a scholarship from St. Leo College, a Division II school in Florida, and chose to attend St. Leo because it was closest to home. In his junior year at St. Leo, Hendricks

received permission to talk with Division I schools about transferring in order to play baseball for a Division I team in his final year of eligibility. Hendricks's father contacted Tim Corbin ("Corbin"), assistant coach at Clemson, to inquire about a transfer for his son.[1] Clemson pursued a one-time transfer exception for Hendricks from the NCAA, and Hendricks applied for admission and was accepted by Clemson.[2] Hendricks received a book scholarship for approximately $200 to $250, but no other scholarship, athletic or otherwise, from Clemson.

At the time of his transfer, Hendricks had earned 80 of the 130 credit hours required for the degree he was pursuing at St. Leo in Business Administration, with a cluster in Restaurant and Hotel Management. Clemson did not offer the same major. When Hendricks decided to transfer to Clemson, he knew he would have to return to St. Leo for a final semester (in essence, for an extra semester) in order to graduate from St. Leo with his original major.

Sometime in August, prior to registration, Hendricks met with the athletic academic advisor assigned to him by Clemson's Student–Athlete Enrichment Program, Barbara Kennedy–Dixon ("Kennedy–Dixon"). As Clemson did not offer Hendricks's major, Kennedy–Dixon advised Hendricks to declare himself a Speech and Communications major. Pursuant to her advice, Hendricks enrolled in fifteen hours for the fall semester. A week and a half into the semester, however, Kennedy–Dixon realized she had not evaluated whether Hendricks was in compliance with the NCAA's fifty-percent rule, which required a student athlete to complete at least fifty percent of the course requirements toward his major to be eligible to compete during his fourth year of college enrollment. Recognizing her mistake, Kennedy–Dixon advised Hendricks to drop one class and add two speech classes, increasing his credit hours from fifteen to eighteen. Hen-

---

1. Hendricks and his father knew Corbin because Corbin attempted to recruit Hendricks out of high school to play for Presbyterian College, where Corbin was coaching at the time.

2. The NCAA has a one-time transfer rule that permits students to transfer one time during their college career to another school without having to sit out for a year after being released from the previous school.

dricks changed his classes as advised. Kennedy–Dixon discussed the mistake with her graduate assistant, but did not report it to the director of the program. A few days before the end of the semester, Kennedy–Dixon realized that she had miscalculated the total number of electives Hendricks could take and, consequently, that he would not comply with the NCAA's fifty percent rule.[3]

Upon discovering her mistake, Kennedy–Dixon filed a waiver application with the NCAA in which she claimed responsibility for Hendricks's failure to satisfy the rule, and requested that the NCAA waive the rule to allow Hendricks to play baseball. The NCAA denied the appeal. Hendricks passed all of his fall course hours and remained at Clemson for the spring semester, but was not allowed to play baseball. He returned to St. Leo the next fall without a scholarship as planned. Hendricks graduated on schedule in December, but stayed on at St. Leo for the spring semester to play baseball because he had not used his final year of eligibility.

Clemson won the NCAA regional title that spring and went to the College World Series. In his deposition, Clemson's head coach, Coach Leggett, stated there was no limit on the number of players allowed on the non-traveling team, but that the traveling team was limited to 25 players. Based on Hendricks's performance in fall practice, Coach Leggett testified it would have been very hard for Hendricks to make the traveling team. Coach Leggett met with Hendricks at the end of the fall semester (before he was aware Hendricks was ineligible) and explained to him that there were 3 players ahead of him in the line-up for both of the positions Hendricks played, catcher and first base.

In her deposition, Kennedy–Dixon admitted her mistakes were likely caused by personal stress she was experiencing at the time. She gave birth to a premature baby in June (before advising Hendricks in August), and was traveling to Greenville

---

3. Hendricks had only twenty-one hours of electives available, rather than the thirty-two calculated by Kennedy–Dixon, due to certain foreign language requirements that Hendricks had not met. Accordingly, six of Hendricks' eighteen hours were excess electives, and he did not meet the fifty percent rule. To comply with the fifty percent rule, Hendricks needed to take twenty hours toward his Speech and Communications major in the fall semester.

daily to visit her baby who remained in neonatal intensive care until October of Hendricks's first semester at Clemson. Kennedy–Dixon described the purpose of her job as follows: "We have a two-fold purpose. . . . We try to help our students maintain academic excellence and certainly to make sure that they remain academically eligible according to the NCAA and graduate."

Hendricks sued Clemson for negligence, breach of fiduciary duty, and breach of contract for Kennedy–Dixon's mistakes that made him ineligible to play baseball at Clemson. The trial court granted Clemson's motion for summary judgment on all causes of action. The Court of Appeals reversed summary judgment, finding that genuine issues of material fact existed regarding the viability of each of Hendricks's causes of action. *Hendricks v. Clemson Univ.*, 339 S.C. 552, 529 S.E.2d 293 (Ct.App.2000).

Clemson raises the following issues on appeal:

I. Did the Court of Appeals err in finding there was a genuine issue of material fact regarding the existence of a duty to support Hendricks's negligence claim?

II. Did the Court of Appeals err in finding there was a genuine issue of material fact regarding the existence of a fiduciary duty between Kennedy–Dixon and Hendricks, as advisor and student?

III. Did the Court of Appeals err in finding a genuine issue of fact regarding the existence of a contract between Hendricks and Clemson?

IV. Did the Court of Appeals err in partially reversing the trial court's holding that Hendricks suffered no measurable damages?

## Law/Analysis

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Hamiter v. Retirement Div. of South Carolina Budget and Control Bd.*, 326 S.C. 93, 484 S.E.2d 586 (1997). In determining whether any triable issues of fact exist, the evidence and all reasonable inferences must

be viewed in the light most favorable to the nonmoving party. *Id.*

## I. Negligence

Clemson argues the Court of Appeals erred when it found Kennedy–Dixon's actions did not amount to gross negligence as a matter of law, and reversed summary judgment for Clemson. We agree that the Court of Appeals erred in reversing summary judgment on this issue, and find that summary judgment was appropriate on the additional ground that Clemson owed no duty to Hendricks.

Both the trial court and Court of Appeals agree that the South Carolina Tort Claims Act ("Tort Claims Act") shields Clemson, as a state-supported university, from liability for loss resulting from "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student ... except when the responsibility or duty is exercised in a *grossly negligent* manner."[4] The Court of Appeals discussed gross negligence at length and then addressed Clemson's claim that it had no duty to ensure students' athletic eligibility. Citing Kennedy–Dixon's description of her *job* duties and the proposition that if an act is voluntarily undertaken, the actor assumes the duty to use slight care, the Court of Appeals found there was at least a factual dispute as to whether Clemson undertook the duty to advise Hendricks concerning compliance with NCAA eligibility standards. *Hendricks,* 339 S.C. 552, 560–561, 529 S.E.2d 293, 297 (citing *Miller v. City of Camden,* 329 S.C. 310, 494 S.E.2d 813 (1997) (discussing assumption of duty by voluntary undertaking)).

"The determination of the existence of a duty is solely the responsibility of the court." *Miller,* 329 S.C. 310, 494 S.E.2d 813 (citing *Ellis v. Niles,* 324 S.C. 223, 479 S.E.2d 47 (1996)). Whether the law recognizes a particular duty is an issue of law to be decided by the Court. *Id.* (citing *Carson v. Adgar,* 326 S.C. 212, 486 S.E.2d 3 (1997)). An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance. *Carson.* Ordinarily, the common law imposes no duty

---

4. S.C.Code Ann. § 15–78–60(25) (Supp.2002) (emphasis added).

on a person to act. Where an act is voluntarily undertaken, however, the actor assumes the duty to use due care. *Id.* (citing *Russell v. City of Columbia,* 305 S.C. 86, 406 S.E.2d 338 (1991)).

Hendricks's argument that Clemson affirmatively assumed a duty of care when it advised him on which courses to take in order to obtain NCAA eligibility does not fit into any of the causes of action previously recognized in South Carolina. Under these circumstances, the Court must determine whether the law will recognize a new duty of care between advisor and student. *Ellis.*

In considering the same question, a California court found the issue of duty to be close, but leaned toward finding no duty due to significant policy concerns. *Brown v. Compton Unified Sch. Dist.,* 68 Cal.App.4th 114, 80 Cal.Rptr.2d 171 (1998). California represents the position of the majority of states in refusing to recognize the tort of "educational malpractice" in claims brought by students alleging they received an inadequate education. *Peter W. v. San Francisco Unified Sch. Dist.,* 60 Cal.App.3d 814, 131 Cal.Rptr. 854 (1976) (seminal case); *Ross v. Creighton Univ.,* 957 F.2d 410 (1992) (considering Illinois state law and citing cases from eleven other states that have considered and rejected educational malpractice claims). Courts addressing inadequate education claims, identify several policy concerns with recognizing an actionable duty of care owed from educators to students: (1) the lack of a satisfactory standard of care by which to evaluate educators, (2) the inherent uncertainties of the cause and nature of damages, and (3) the potential for a flood of litigation against already beleaguered schools. *Peter W.; Ross.*

Although Hendricks is not alleging he received an inadequate education while at Clemson, his claim regarding his advisor's negligence should fail for the same reasons courts have refused to recognize a duty in inadequate education cases. In *Brown v. Compton Unified Sch. Dist.,* a high school student sued his school for negligently advising him on which classes to take, resulting in his being ineligible to play basketball at the University of Southern California, and, consequently, in him losing his basketball scholarship from that university. 80 Cal.Rptr.2d at 172. Although the court recognized his

damages (the loss of the scholarship) were more readily identifiable than in the normal educational malpractice claim, the court gave great weight to the policy considerations discussed above. *Id.* Ultimately, the court found the school immune based on a statute granting immunity to public employees for negligent misrepresentations, but its analysis, recognizing the dangers of imposing a duty on student advisors, is instructive in this case. *Id.* at 173.

We believe recognizing a duty flowing from advisors to students is not required by any precedent and would be unwise, considering the great potential for embroiling schools in litigation that such recognition would create. Further, the Court of Appeals citation to *Miller,* indicating a duty may have been created by Clemson's voluntary undertaking to advise Hendricks to ensure NCAA eligibility, is inapposite. 329 S.C. 310, 494 S.E.2d 813. The line of cases *Miller* discusses have thus far been limited to situations in which a party has voluntarily undertaken to prevent physical harm, not economic injury.

Because we find Clemson did not owe a duty to Hendricks, it is unnecessary to discuss whether Kennedy–Dixon's mistakes *could* amount to gross negligence as required for recovery under the Tort Claims Act. S.C.Code Ann. § 15–78–60(25).

## II. Fiduciary Duty

Hendricks argues there is a genuine issue of material fact regarding whether Clemson owed him a fiduciary duty. We disagree.

Whether there is a fiduciary relationship between two people is an equitable issue. *Island Car Wash, Inc. v. Norris,* 292 S.C. 595, 358 S.E.2d 150 (Ct.App.1987). Generally, legal issues are for the determination of the jury and equitable issues are for the determination of the court. *Id.* "A confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *O'Shea v. Lesser,* 308 S.C. 10, 15, 416 S.E.2d 629, 631 (1992) (citing *Island Car Wash,* 292 S.C. at 599, 358 S.E.2d at 152). This Court has recognized certain relationships are by nature

fiduciary, such as the attorney client relationship. *O'Shea.* The relationship between advisor and student has not been so recognized thus far.

Although whether a fiduciary relationship has been breached can be a question for the jury, the question of whether one should be imposed between two classes of people is a question for the court. The Court of Appeals cites *Hotz v. Minyard* for the proposition that the existence of a fiduciary duty may be a factual question for the jury. 304 S.C. 225, 403 S.E.2d 634 (1991). In our opinion, they have misapprehended *Hotz.* In that case, the plaintiff alleged breach of a fiduciary duty by an attorney who had represented both her and her father. *Id.* The Court found evidence of the existence of a confidential, on-going attorney client relationship between plaintiff and the attorney, and then held there was a factual issue presented whether the attorney had *breached* a fiduciary duty under the circumstances presented. *Id.* The Court sent the issue of breach, not the existence of the relationship, to the jury. *Id.*

Historically, this Court has reserved imposition of fiduciary duties to legal or business settings, often in which one person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters. We decline to recognize the relationship between advisor and student as a fiduciary one.

### III.  Breach of Contract

Hendricks argues there is at least a genuine issue of material fact regarding the existence of a contract between him and Clemson. We disagree.

A contract is formed between two people when one gives the other sufficient consideration either to perform or refrain from performing a particular act. *Benya v. Gamble,* 282 S.C. 624, 321 S.E.2d 57 (Ct.App.1984). Offer and acceptance are essential to the formation of a contract. *Id.* (citing *Pierce v. Northwestern Mutual Life Ins. Co.,* 444 F.Supp. 1098 (D.S.C.1978)). If the evidence is conflicting or raises more than one reasonable inference, the issue should be submitted to the jury. *Benya.*

For support, Hendricks and the Court of Appeals cite cases from several jurisdictions that have acknowledged the possibility that "the relationship between a student and a university is at least in part contractual." *Carr v. St. John's University,* 17 A.D.2d 632, 231 N.Y.S.2d 410 (1962), *affirmed without opinion,* 12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962). Many of these cases involve disputes between student athletes and their schools. *Ross v. Creighton Univ.,* 957 F.2d 410 (7th Cir.1992); *Taylor v. Wake Forest Univ.,* 16 N.C.App. 117, 191 S.E.2d 379 (1972). Other cases involve claims related to the quality of the education received by the student. *CenCor, Inc. v. Tolman,* 868 P.2d 396 (Colo.1994); *Wickstrom v. North Idaho College,* 111 Idaho 450, 725 P.2d 155 (1986).

All of these cases, however, recognize that not all aspects of the student/university relationship are subject to a contract remedy. *CenCor,* 868 P.2d 396; *Ross,* 957 F.2d 410. Just as courts have prohibited recovery in tort for educational malpractice claims, courts have been equally reluctant to permit claims relating to academic qualifications of students or to the quality of education received when they are brought in contract. In barring contract actions for educational malpractice claims, courts have noted that the policy concerns that preclude those claims in tort apply with equal force when the claim is brought in contract. In *Ross,* a student athlete sued the university alleging that the university accepted him knowing he was not qualified academically to participate in its curriculum, and made a specific promise to provide certain services to him to enable him to participate meaningfully in the academic curriculum. *Ross,* 957 F.2d at 411–12. The court allowed the claim to proceed as a breach of contract action, but made clear that the lower court would not reach the question of whether the university had provided *deficient* academic services. *Id.* at 417. The court limited the inquiry to a determination of whether the university had provided *any* real access to its academic curriculum at all. *Id.*

In *CenCor,* the court adhered to the same distinction, delineating between subjective and objective claims. In that case, the plaintiffs asserted that certain provisions of their enrollment agreements and the school's catalog constituted express contract terms. *CenCor,* 868 P.2d at 399. The court allowed plaintiffs' breach of contract claims to go forward to

the extent it referenced "specific services for which the [plaintiffs] allegedly paid and which Cencor allegedly failed to provide." The court placed no value on the plaintiffs' general allegations that they had not received the education they had been promised, and instead made clear that the claim was proceeding based on the plaintiffs' allegations that Cencor had obligated itself to provide such tangible things as modern equipment and computer training for all students. 868 P.2d at 400.

Clemson admits that some aspects of the student/university relationship are indeed contractual, but argues Hendricks has not pointed to an identifiable contractual promise that Clemson failed to honor in this case. We agree. Hendricks fails to point to any written promise from Clemson to ensure his athletic eligibility, and submits no real evidence to support his claim that such a promise was implied. He did not discuss NCAA academic eligibility until he was already enrolled at Clemson. His conversations with Kennedy–Dixon in June, according to both his deposition and Kennedy–Dixon's deposition, were limited to what major would most easily transfer back to St. Leo.

Hendricks's claim calls for an adjudication of the *deficiency* of Clemson's services. As such, allowing Hendricks's claim to proceed would invite courts to engage in just the type of subjective analysis that courts prohibiting educational malpractice claims in tort and contract have avoided.

## IV. Damages

As discussed, we find no actionable duty or contract existed under the circumstances presented. Accordingly, it is unnecessary to address Hendricks' claim for damages.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the Court of Appeals and reinstate the trial court's grant of summary judgment in favor of Clemson on all causes of action.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.