In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2988

KELSEY DELISLE and KAITLIN PENNINGTON,
on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

MCKENDREE UNIVERSITY,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:20-cv-1073 — **Staci M. Yandle**, *Judge.*

ARGUED MAY 17, 2023 — DECIDED JULY 12, 2023

Before RIPPLE, SCUDDER, and LEE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. We return yet again to the contractual implications of COVID-19-related university campus closures in spring 2020. Twice now we have explained how certain pieces of evidence—including a university's course catalogs, class registration system, and pre-pandemic practices—can suffice under Illinois law to allege the existence of an implied contract between a university and its students for

in-person instruction and extracurricular activities. See *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 884 (7th Cir. 2022); *Hernandez v. Illinois Inst. of Tech.*, 63 F.4th 661, 669 (7th Cir. 2023). Those precedents control here. Although the complaint in this case pales in comparison to the allegations in *Gociman* and *Hernandez*, it is still enough—if barely—to state a claim at the pleading stage. We therefore reverse the district court's dismissal of the case and remand for further proceedings.

## I

Like *Gociman* and *Hernandez*, this case comes to us as a diversity suit dependent on Illinois law. Evaluating Delisle's claim therefore requires understanding how our decisions in *Gociman* and *Hernandez* interpreted and applied Illinois contract law. Only then can we assess the facts alleged and determine whether they are enough to state a claim for breach of an implied contract.

## A

Under Illinois law, the relationship between students and universities is a contractual one. See *Gociman*, 41 F.4th at 883; *Hernandez*, 63 F.4th at 666–67 (citing *Bosch v. NorthShore Univ. Health Sys.*, 155 N.E.3d 486, 495 (Ill. App. Ct. 2019)). To be more precise, "Illinois law generally recognizes an implied contract between a student and a school." *Bosch*, 155 N.E.3d at 495; see also *Gociman*, 41 F.4th at 883 (explaining that "the general nature and terms of the agreement are usually implied" in the university context (quoting *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992))). That means the parties' obligations under the contract are "inferred from the facts and conduct of the parties, rather than from an oral or written agreement." *Hernandez*, 63 F.4th at 667 (quoting *BMO*

*Harris Bank, N.A. v. Porter*, 106 N.E.3d 411, 421 (Ill. App. Ct. 2018)). But make no mistake, a student's implied contract with their university is enforceable, just like an express contract would be. See *id.* (citing *Steinberg v. Chicago Med. Sch.*, 371 N.E.2d 634, 640 (Ill. 1977)).

Even so, students may not come to court to question the quality of their education or to challenge academic decisions made by their universities. Such "educational malpractice" lawsuits are not cognizable under Illinois law. *Gociman*, 41 F.4th at 882 (citing *Waugh v. Morgan Stanley & Co.*, 966 N.E.2d 540, 555 (Ill. App. Ct. 2012)); *Hernandez*, 63 F.4th at 669–70 (same). So for a student to make out a valid breach-of-contract claim against their university, they must "point to an identifiable contractual promise," as opposed to an implied promise of educational quality, "that the [university] failed to honor." *Gociman*, 41 F.4th at 882 (quoting *Ross*, 957 F.2d at 417).

In *Gociman* and *Hernandez* we applied these principles to allegations that two Illinois universities made contractual promises to offer in-person instruction and then breached those promises by switching to remote instruction following the full onset of the COVID-19 pandemic in spring 2020. The crux of our holding in *Gociman* was that students can establish the existence of an implied contract for in-person instruction and access to campus facilities and services by pointing to four primary sources of evidence:

- a university's statements in its official publications, such as course catalogs;

- its class registration system and related policies;

- its pre-pandemic practice; and

- any cost differential between in-person and online programs.

See *id.* We reaffirmed this approach in *Hernandez*. See 63 F.4th at 668. We also clarified that courts can infer the existence of an implied contract for in-person instruction even absent a difference in price between in-person and online programs as long as the plaintiffs can allege that the university "treat[s] its online courses as 'separate and distinct products.'" *Id.* at 669. Evidence of a cost differential, though probative, is therefore not dispositive.

B

McKendree University—like Loyola University (in *Gociman*) and the Illinois Institute of Technology (in *Hernandez*)—closed its campus and switched to remote instruction in March 2020 due to the risks of COVID-19. And like Loyola and IIT, McKendree already ran an online degree program in addition to its on-campus degree program. Following the campus shutdown, McKendree did not refund its in-person students for any portion of their tuition or fees.

Kelsey Delisle and Kaitlin Pennington were students enrolled in McKendree's on-campus program at the time of the shutdown. Along with a putative class of other students enrolled in McKendree's on-campus program in spring 2020, they sued McKendree for breach of contract and unjust enrichment based on its decision to switch to remote instruction. Though they filed the case in Illinois state court, McKendree removed it to federal court pursuant to the Class Action Fairness Act. See 28 U.S.C. § 1453(b).

About a year before we decided *Gociman*, the district court dismissed Delisle's complaint for failure to state a claim. See

Fed. R. Civ. P. 12(b)(6). The district court first held that the Illinois doctrine of educational malpractice did not bar Delisle's claims, which went to the manner, not the quality, of McKendree's instruction and services. McKendree, for its part, does not contest that conclusion on appeal. The district court then rejected Delisle's contract claims. It explained that no express contract existed (which Delisle accepts on appeal) and that "website descriptions" and "pre-pandemic practice" were insufficient to establish the existence of an implied contract. Finally, the district court dismissed Delisle's alternative claim of unjust enrichment because she had incorporated allegations of a contract into that claim, and an unjust enrichment claim is viable only if no contract existed.

Delisle now appeals.

## II

The district court did not have the benefit of our recent decisions in *Gociman* and *Hernandez*. Even so, the district court made some poignant observations—particularly regarding Delisle's use of statements from McKendree's public-facing website—that we wish to highlight before we get to the significance of *Gociman* and *Hernandez*.

## A

Delisle's complaint relies heavily on McKendree's website for support. Indeed, her complaint is chock-full of screenshots and quotes from the website like the following:

- "As a Bearcat, you'll join a vibrant community, make valuable connections, and serve others in the world around you. You'll develop strong leadership skills, learn from expert faculty, and attain the personalized education you deserve."

- "Our 234 acre campus is home to 43 buildings and 5 residential communities."

- "The inclusive spirit and tight community ensure fun and exciting things to do on campus, including athletic events, campus organizations, fine arts events, worship services, and much more! The opportunity to interact outside the classroom is greatly appreciated by our students, faculty and staff."

- A screenshot of McKendree's website that includes separate hyperlinks for "Undergraduate Programs," "Graduate Programs," and "Online Programs."

Delisle offers this kind of evidence to bolster her claim that "[i]n recruiting students, McKendree promotes many benefits associated with its in-person services that do not remain when it offers only online instruction away from campus."

The district court characterized these quotes as "essentially marketing materials" and explained that they are neither "among the terms of the contract between universities and their students" nor a "guarantee [of] the exact same experience offered in the photographs, words, and descriptions found on the website." This seems correct to us. And our impression comports with fundamental principles of Illinois implied contract law. See *ESP Global, LLC v. Nw. Cmty. Hosp.*, 158 N.E.3d 721, 726 (Ill. App. Ct. 2020) (requiring "circumstances demonstrating that the parties intended to be bound" in order to establish an implied contract); *Gociman*, 41 F.4th at 884 ("[T]he student's complaint must be specific about the source of the implied contract, the exact promises the university made to the student, and the promises the student made in return." (quoting *Charleston v. Bd. of Trustees of the Univ. of*

*Illinois at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013))). And it aligns with how we think about implied contracts in other commercial contexts. See, *e.g.*, *Hughes v. Sw. Airlines Co.*, 961 F.3d 986, 989–90 (7th Cir. 2020) (finding that Southwest's marketing statements on its website did not establish implied terms of a contract with its passengers). There is no reason to think Illinois courts would treat universities any differently.

To his credit, Delisle's counsel acknowledged at oral argument that marketing materials alone cannot give rise to an implied contract. But, relying on *Hernandez*, Delisle contends that a university's statements on its website can nevertheless be evidence of its prior practice—indisputably one of the four sources of evidence we have looked to when assessing whether an implied contract exists between a university and its students. See *Hernandez*, 63 F.4th at 668 (relying in part on Hernandez's claims that "IIT's marketing materials touted the many facilities and resources on its two campuses and encouraged prospective students to visit campus 'to see where you'll learn, live, eat, and have fun'").

We agree. A university's own descriptions of its pre-pandemic practices can certainly "support[ ] a reasonable inference that in-person instruction, along with access to on-campus facilities, is a norm for students enrolled in the traditional on-campus program." *Gociman*, 41 F.4th at 885. But marketing statements on a public-facing website are neither terms of an express contract themselves nor enough to establish an implied contract, as they do not clearly demonstrate an "intent to be bound." *ESP Global*, 158 N.E.3d at 726. To permit an inference that the parties reciprocally agreed to enter into a legally enforceable agreement, there must be something more.

B

And Delisle did allege more than just marketing. She pointed to McKendree's college catalog and student handbook, which are among the "catalogs, bulletins, circulars, regulations, and other publications" that we considered in *Gociman* and *Hernandez*. See 41 F.4th at 883; 63 F.4th at 667. As Delisle identified in her complaint, McKendree's college catalog appears to differentiate between the university's on-campus and online programs: "McKendree University reserves the right to restrict enrollment in classes designed for certain academic populations to members of those populations. Undergraduate students attending the Lebanon campus may take only one online course per semester." The catalog also described the university's "Student Services," which included several physical buildings on campus such as the library, the disability-services office, a writing center, and a performing arts venue. McKendree's student handbook likewise described on-campus buildings, services, and activities available to students. Our precedent makes clear that this kind of language is "enough for the court to make the reasonable inference—at the pleading stage—that students were promised in-person instruction." *Gociman*, 41 F.4th at 885 n.6.

Delisle also makes sufficient allegations about McKendree's pre-pandemic course of practice to support her claim that an implied contract existed for in-person instruction and services. Her complaint states that before March 2020 students paid McKendree "tuition and fees and in return were provided with in-person services, including … in-person classes and access to campus facilities, libraries, buildings, activities, and organizations." And her many citations to McKendree's public-facing website—though not themselves

sufficient to establish the university's past practice, as we have underscored—bolster her contention that it was typical for McKendree to provide in-person instruction and services prior to March 2020. These allegations parallel the ones we relied on in *Gociman* and *Hernandez*. See 41 F.4th at 885 ("Prior to March 2020, Loyola provided students in-person instruction and access to on-campus facilities."); 63 F.4th at 668 ("IIT has a long-established practice of providing in-person instruction and on-campus resources."). And they "support[ ] a reasonable inference that in-person instruction, along with access to on-campus facilities, is a norm for students enrolled in the traditional on-campus program." *Gociman*, 41 F.4th at 885.

Delisle's remaining evidence of an implied contract is much weaker. Regarding McKendree's class registration system, Delisle only offers the naked assertion that "when students sign up for courses, [McKendree] represents the location of the course, or whether it is online." Of course, at the pleading stage, that claim can still support a reasonable inference that the registration portal contained statements that implied a contract for in-person instruction. See *id.* at 885 n.6 (explaining that the nuts and bolts of how a university's registration system operates "is an issue better sorted out at the merits stage"). Still, it is flimsy compared to the detailed complaints in *Gociman* and *Hernandez*, both of which included screenshots of and direct quotes from the universities' registration portals.

Delisle also did not allege any tuition difference between McKendree's online and in-person programs. As we explained in *Hernandez*, that is not dispositive at this stage (though it may prove relevant when damages are at issue). See 63 F.4th at 669. It simply means Delisle has less to go on

in her effort to establish an implied contract for in-person in-struction and services.

Still, when we follow the roadmap that we laid out in *Goci-man* and *Hernandez*, we conclude that Delisle has sufficiently alleged the existence of an implied contract for in-person in-struction and services. Her claims regarding McKendree's course catalog, student handbook, and pre-pandemic practice are themselves adequate, even if her other allegations are thinner. *Gociman* and *Hernandez* did not chisel into stone an inflexible four-part test for courts to follow in cases like this one. Instead, they tell us to consider various sources of evi-dence—a university's catalogs, registration system, pre-pandemic practice, and tuition differentials—to determine whether a reasonable factfinder could infer that the university intended to be bound to an agreement to provide its students in-person classes and services. See *Gociman*, 41 F.4th at 883–84. Measuring Delisle's complaint against our precedent, she has alleged just enough to survive McKendree's motion to dismiss.

## C

We now add a brief word on Delisle's alternative claim for unjust enrichment. Delisle made the same pleading mistake that the *Gociman* plaintiffs did: she incorporated allegations of a contract into her unjust enrichment claim. That creates a problem because unjust enrichment is a viable legal theory only if there is no contract in the first place. See *id.* at 886–87.

In *Gociman* we explained that "it is typically premature to dismiss an unjust enrichment claim" before "the validity or the scope of a contract is determined." *Id.* at 887. We further clarified that, as a general rule, "plaintiffs are entitled to at

least one chance to amend their complaint to cure an error in response to a district court's dismissal order unless amendment would be futile or otherwise unwarranted." *Id.* So we instructed the district court to permit the students to amend their complaint and cure their pleading error. See *id.*

We see no reason to do anything different here. On remand, the district court should permit Delisle to amend her allegations regarding unjust enrichment.

### III

We close by repeating a reminder we offered in *Hernandez*:

> [T]here are many cases similar to this one and *Gociman*. Some will survive a motion to dismiss, and others will not. Breach-of-contract claims demand fact-specific inquiries. Our analysis should not be read to imply that in-person instruction and physical campus access are implied terms of every student-university contract.

63 F.4th at 669. In light of *Gociman* and *Hernandez*, Delisle's complaint just clears the line of what is enough to allege an implied contract for in-person instruction and services. We therefore REVERSE the district court's dismissal of the case and REMAND for further proceedings consistent with this opinion.