ESTATE OF Levi BUTLER, by and through his Personal Representative, Joshua BUTLER, Plaintiff,

v.

MAHARISHI UNIVERSITY OF MANAGEMENT, Defendant,

and

Maharishi University of Management, Third–Party Plaintiff,

v.

Shuvender Sem, Third–Party Defendant.

No. 4:06–cv–00072–JEG.

United States District Court, S.D. Iowa, Central Division.

Dec. 11, 2008.

David Wayne Nelmark, Mark E. Weinhardt, Stephen R. Eckley, William B, Ortman, Belin Lamson McCormick Zumback & Flynn, P.C., Des Moines, IA, Lawrence F. Scalise Coppola, McConville, Coppola, Hockenberg & Scalise, West Des Moines, IA, for Plaintiff.

Nathan John Overberg, Richard G. Santi, Amanda G. Wachuta, David H. Luginbill, Ahlers & Cooney PC, Jodie Lynn Clark, Davis Brown Koehn Shors & Roberts PC, Des Moines, IA, for Defendant.

Nathan John Overberg, Amanda G. Wachuta, David H. Luginbill, Ahlers & Cooney PC, Richard G. Santi, Ahlers Cooney Dorweiler Haynie Smith & Allbee, Des Moines, IA, for Third–Party Plaintiff.

Alfredo G. Parrish, Tammy Marie Westhoff–Gentry, Parrish Kruidenier Dunn Boles Gribble, Cook Parrish Gentry & Fisher LLP, Harry Perkins, III, Robin L. Hermann, Patterson Lorentzen Duffield Timmons, Des Moines, IA, for Third–Party Defendant.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter now comes before the Court on a Motion for Partial Summary Judgment by Maharishi University of Management (MUM) against the Estate of Levi Butler (the Estate or Plaintiff), which Plaintiff resists. The Court held a hearing on the motion on April 25, 2008. Attorney David Luginbill represented MUM; attorney Mark Weinhardt represented Plaintiff.

Also before the Court is MUM's Motion to Strike, which Plaintiff resists. MUM requested oral argument; however, the Court finds the briefing adequately addresses the motion to strike, and therefore no oral argument is necessary.[1] These matters are now fully submitted and ready for disposition.

## I. BACKGROUND[2]

The following facts are not in dispute. Levi Butler (Levi) graduated from high school in May 2002 and attended a local community college for one year. In June 2003, as Levi considered attending a four-year university, Levi's brother, Joshua Butler (Joshua), suggested that Levi look at MUM. Levi explored MUM's website and became interested in MUM's "Sustainable Living" major. Levi received recruitment materials from MUM and reviewed those materials and MUM's website with his father, Khaldun Butler (Khaldun), and his mother, Evelyn Butler (Evelyn). Levi submitted an application and received an acceptance letter from MUM on August 7, 2003. Levi moved to the MUM campus in Fairfield, Iowa, and began the MUM program on August 18, 2003.

In December 2003, Shuvender Sem (Sem) contacted MUM to inquire about attending the university. On December 15, 2003, Sem had a phone interview with MUM admissions representative Leora Rosenberg. Sem completed an application

---

1. At oral argument on the Motion for Partial Summary Judgment, the Court advised counsel of its intention to consider the Motion to Strike in the context of what weight to be accorded the evidence at issue, and in that context the opportunity for argument was provided.

2. Additional underlying facts of this case are set forth in the Court's January 17, 2008, Order. In that order and this, the Court relies upon undisputed facts and otherwise, in analyzing the claims at issue, gives the non-moving party the benefit of all reasonable inferences and views the facts in the light most favorable to that party. *See, e.g., Liberty Mut. Fire Ins. Co. v. Scott,* 486 F.3d 418, 422 (8th Cir.2007).

on January 1, 2004, and began attending classes at MUM shortly thereafter. As part of MUM's admissions process, Sem began receiving transcendental meditation (TM) instruction on January 19, 2004.

On March 1, 2004, suddenly and without apparent provocation, Sem stabbed fellow student John Killian (Killian) in the face and throat with a pen. Two fellow students were restraining Sem when Dr. Samuel Boothby (Dr. Boothby), a MUM administrator, approached the group. Dr. Boothby led Sem into an adjoining conference room and discussed the attack. Dr. Boothby questioned Sem about any relationship Sem might have had with John Killian and what Sem had done earlier that day, including Sem's TM technique. Dr. Boothby informed Sem he was using an improper technique when completing his TM exercises. MUM administration did not summon law enforcement or campus security; instead, Sem was placed into the custody of MUM's dean of men, Joel Wynsong (Wynsong). Killian went unassisted to the hospital, where he received several stitches.

Wynsong took Sem to Wynsong's on-campus apartment. Once at his apartment, Wynsong began his own meditation exercises, and, after completing his meditation, Wynsong discovered Sem had left the apartment. Wynsong located Sem in the campus dining hall and decided to allow Sem to mingle with the students. Sem began another abrupt and unpro-voked attack on fellow student Levi Butler, stabbing Levi multiple times with a knife. Levi died from multiple stab wounds to the chest.[3]

Sem was taken into custody, and on March 3, 2004, Dr. James Brooks (Dr. Brooks) performed a psychiatric examination. Dr. Brooks noted Sem had a history of chronic paranoid schizophrenia and had been treated with anti-psychotic medication but ceased taking the medication several weeks before coming to MUM in January 2004. Dr. Brooks also noted Sem had been to the MUM health clinic in January but had not been treated for psychosis at that time.

On February 24, 2006, the Estate filed this action against MUM and Maharishi Vedic Education Development Corporation (MVED), asserting claims for premises liability (count one), fraudulent misrepresentation (count two), and negligence (count three). On September 24, 2008, the Court granted MVED's second motion for summary judgment and dismissed all claims against MVED.

On January 30, 2008, MUM filed the present motion for partial summary judgment, arguing Plaintiff's claims for fraudulent misrepresentation, negligent misrepresentation, and negligent screening or admission of students fail as a matter of law and must be dismissed.[4] MUM also moved to strike affidavits[5] filed in support of Plaintiff's resistance to MUM's Motion for Partial Summary Judgment.

---

**3.** In the subsequent state criminal proceedings, Sem was found not guilty by reason of insanity and committed to a hospital setting.

**4.** MUM also moved for summary judgment on Plaintiff's claim alleged in paragraph 91(e) of the amended complaint, which states that MUM "fail[ed] to properly teach TM techniques to Shuvender Sem." MUM contends the claim is fashioned as an educational malpractice action, which is not recognized under Iowa law. Plaintiff's counsel withdrew

the claim at the April 25, 2008, hearing. Accordingly, the motion for summary judgment as to the claim alleged in paragraph 91(e) is herein denied as moot.

**5.** MUM also moved to strike material Plaintiff compiled from an anti-TM website, arguing the material lacked foundation. For purposes of resisting MUM's motion for partial summary judgment, Plaintiff withdrew the material. Therefore, MUM's motion to strike that material is herein denied as moot.

## II. DISCUSSION

### A. MUM's Motion to Strike

MUM moves to strike the affidavits of Charles Knoles (Knoles) and Dr. Kai Druhl (Dr. Druhl), arguing that the statements contained in the affidavits are inadmissible because they do not meet the requirements of Federal Rule of Civil Procedure 56(e)(1), which states, "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

### 1. Affidavit of Charles Knoles

██ MUM cites portions of statements made in Knoles' affidavit and argues the affidavit is "littered" with inadmissible hearsay, allegations not based on personal knowledge, and lay opinions not based on personal knowledge. Plaintiff argues MUM fails to raise specific objections to individual paragraphs, making it impossible for Plaintiff to defend the admissibility of specific statements, and therefore MUM's sweeping objections are insufficient to support a motion to strike.

In the first three paragraphs of Knoles' affidavit, Knoles identifies himself as a student at MUM between May 2001 and June 2004 and states that he knew both Levi and Sem. Subsequent paragraphs describe Knoles' own personal experiences on the MUM campus. These statements are clearly based on Knoles' personal knowledge and demonstrate Knoles' competence to testify to these relevant matters. Fur-

thermore, some of the statements MUM broadly challenges as inadmissible hearsay do not appear to be offered for the truth of the matters asserted and therefore are not hearsay. *See* Fed.R.Evid. 802.

As this Court has stated before,

Any defects [to an affidavit] are best addressed by reducing the weight accorded to the affidavit and not by striking the document in its entirety. *See Maytag Corp. v. Electrolux Home Prods., Inc.,* 448 F.Supp.2d 1034 (N.D.Iowa 2006) (finding it unnecessary to strike when court can simply disregard inadmissible portions); *see also Sholl v. Plattform Advertising, Inc.,* 438 F.Supp.2d 1303, 1307 (D.Kan.2006) ("[T]he Court ordinarily does not strike affidavits but simply disregards those portions which ... do not comply with Rule 56(e)"); *Edwards v. Texas–New Mexico Power Co.,* 259 F.Supp.2d 544, 546 (N.D.Tex.2003) (denying motion to strike; rather than strike portions of affidavit, [the] "court will give the summary judgment evidence whatever weight it may deserve").

*Pekin Ins. Co. v. Tysa, Inc.,* No. 3:05–cv–00030, 2006 WL 3827232, at *4 (S.D.Iowa Dec.27, 2006). The Court will follow this practice in considering Knoles' affidavit and thus denies MUM's motion to strike Knole's affidavit.

### 2. Affidavit of Dr. Druhl

██ MUM next argues Dr. Druhl's affidavit should be stricken for lack of personal knowledge because Dr. Druhl admits he worked for MUM four years prior to the events that are the subject of this lawsuit.[6] Plaintiff argues Dr. Druhl's affi-

---

6. MUM also argues Dr. Druhl's affidavit should be stricken because, as initially filed, Dr. Druhl's affidavit contained noncompliant electronic signatures in violation of Rule 56(e) and Local Rules 5.2(g)(7) and (h). In response to MUM's motion to strike, Plaintiff attached Dr. Druhl's signed affidavit. The

text of the affidavit is identical to the previously filed, electronically-signed affidavit. Despite this correction, MUM nonetheless asks the Court to strike the affidavit due to Plaintiff's inattention or, in the alternative, to order Plaintiff to pay MUM's attorney fees

davit attests to the culture and practices at MUM and provides background information about TM.

After reviewing Dr. Druhl's affidavit, the Court concludes that the statements therein are based on Dr. Druhl's personal knowledge and experience. Furthermore, Dr. Druhl's statements are relevant to the issue of MUM's administrative practices, which are at issue in this case. The Court will simply disregard any portions of the affidavit that do not comply with Rule 56(e) and thus denies MUM's motion to strike Dr. Druhl's affidavit in its entirety.

### B. Summary Judgment Standard

"[C]laims lacking merit may be dealt with through summary judgment under Rule 56." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Summary judgment is a drastic remedy, and the Eighth Circuit has recognized that it "must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1118 (8th Cir.2006) (quotation omitted). However, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law," judgment should be rendered. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *P &*

*O Nedlloyd, Ltd. v. Sanderson Farms, Inc.,* 462 F.3d 1015, 1018 (8th Cir.2006).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Heisler v. Metro. Council,* 339 F.3d 622, 631 (8th Cir.2003) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). "If the moving party has carried its burden, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.,* 361 F.3d 465, 468 (8th Cir.2004). The Court gives the nonmoving party the benefit of all reasonable inferences and views the facts in the light most favorable to that party. *Liberty Mut. Fire Ins. Co. v. Scott,* 486 F.3d 418, 422 (8th Cir.2007); *de Llano v. Berglund,* 282 F.3d 1031, 1034 (8th Cir. 2002).

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Hayek v. City of St. Paul,* 488 F.3d 1049, 1054 (8th Cir.2007) (citing *Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1006 (8th Cir. 2005)). Summary judgment should not be granted if the Court can conclude that a reasonable trier of fact could return a ver-

and costs associated with bringing this motion to strike.

Signatures aside, Dr. Druhl's substituted affidavit is identical in all other respects to the affidavit Plaintiff initially filed. MUM filed the motion to strike, attacking the substance of the affidavit as well as the noncomplying signature. The Court cannot find MUM was prejudiced, and therefore striking the affidavit or ordering other sanctions is not appropriate on this record. *See Perez Montero v. CPC Logistics, Inc.,* 536 F.Supp.2d 135, 142 (D.P.R.2008) (denying the plaintiff's motion to strike an affidavit filed without a signature page reasoning the court would be lenient over the clerical error because the defendant remedied the error by filing a complete affidavit in response to the plaintiff's motion to strike); *Lancaster v. Phillips Invs., LLC,* 482 F.Supp.2d 1362, 1365–66 (M.D.Ala.2007) (denying the defendant's motion to strike an affidavit originally filed with an electronic signature where the plaintiff filed a copy of the original, signed affidavit in response to the court's order to show cause).

dict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005) ("If a reasonable jury could return a verdict for the non-moving party based on the evidence presented, summary judgment is inappropriate.").

MUM argues Plaintiff's claims for fraudulent misrepresentation, negligent misrepresentation, and negligent screening or admission of students fail as a matter of law and must be dismissed.

## C. Fraudulent Misrepresentation

 "The elements of fraudulent misrepresentation are (1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury." *Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005) (citing *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004)). A claim of fraudulent misrepresentation must be proven "by a preponderance of the clear, satisfactory, and convincing evidence." *Id.*

In the amended complaint, Plaintiff alleges MUM made the following fraudulent statements to Levi Butler:

(a) that the Maharishi University of Management campus provides a "safe, peaceful environment" because "every student, faculty member, and administrator practices the Transcendental Meditation technique, which eliminates stress that is the basis of crime and other social problems";

(b) "these techniques are proven, effective procedures for eliminating crime";

(c) the community of Fairfield is "a safe haven of peace, friendship, and zero crime";

(d) "the campus itself is safe and violence-free";

(e) University Security personnel "work closely with state and local police agencies ... who are called on campus to physically detain and arrest individuals if necessary";

(f) "Ideal administrators are further informed of relevant security procedures";

(g) "Campus Security promptly reports all criminal actions to the appropriate state, local, or federal authorities for assistance and/or prosecution";

(h) "Notice of disruptive behavior, when such notice may be a preventive aid, is provided personally to affected students through their dormitory resident advisor or faculty tutor";

(i) "Serious crimes are required to be reported by Maharishi University of Management to the University community"; and

(j) there had been only one instance of assault on or near the campus in the previous four years and no other crimes against persons during this period.

Am. Compl. 17–18.

MUM argues Plaintiff has failed to show that MUM in fact made some of these representations to Levi, that the representations actually made were false when MUM made them, or that Levi relied on those representations made.

## 1. Representations

 MUM does not deny that these representations appear in various MUM recruitment materials or on MUM's website. MUM asserts, however, the representations contained in subparagraphs (a) and (d) above are from a letter written by MUM's Student Affairs Council Chairman Richard Neate, which can only be found in MUM's "Comments from Parents" brochure. MUM argues because the Com-

ments from Parents brochure was not with Plaintiff's deposition exhibits, there is no evidence in the record that MUM ever made those representation to Levi Butler.

Levi's father, Khaldun, testified that he saw a colored brochure that "had photographs of the campus and classes and interviews with parents" amongst the recruitment materials Levi received from MUM. Although Khaldun and Evelyn may no longer have had Levi's copy of one of MUM's recruitment brochures many months after Levi's death, that does not preclude a determination on the record evidence that the brochure was available to Levi. MUM does not refute that Khaldun's description of the brochure accurately describes it or that the Comments from Parents brochure is MUM's only color brochure and the only MUM brochure containing parent comments. Nor does MUM deny that the Comments from Parents brochure is promotional in nature and unquestionably directed at prospective students and their parents. MUM does not suggest that the Comments from Parents brochure is an obscure document not typically sent to parents along with other recruitment materials. Viewing the facts in the light most favorable to Plaintiff, and given that the Comments from Parents brochure is readily accessible and Khaldun gave sworn testimony that he and Levi reviewed a color brochure fitting the description of the Comments from Parents brochure, the Court finds credible evidence exists upon which a reasonable juror could find Levi did review the brochure, and therefore MUM made the representations therein to Levi.

### 2. Materiality and Falsity

 MUM next argues that each of these alleged statements constitute nothing more than honest opinion and fail to satisfy one or more of the required elements of fraud under Iowa law.

A mere statement of an honest opinion, as distinguished from an assertion of fact, will not amount to fraud, even though such opinion be incorrect. When the statements become representations of fact, or the expression of opinion is insincere and made to deceive or mislead, they may be treated as fraudulent. Whether such is their quality and character is ordinarily a jury question.

*Hoefer v. Wis. Educ. Ass'n Ins. Trust,* 470 N.W.2d 336, 340 (Iowa 1991). "Whether a statement is one of fact or of opinion depends on all the facts and circumstances of a particular case." *Tralon Corp. v. Cedarapids, Inc.* 966 F.Supp. 812, 828 (N.D.Iowa 1997).

A statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context. Courts focus on the circumstances surrounding the representation to determine whether the plaintiff may have justifiably relied on the opinion as though it were a statement of fact. Among the relevant factors in such a case are the access of the parties to outside information and the relative sophistication of the parties. The Illinois Supreme Court said in *Buttitta:*

> Wherever a party states a matter which might otherwise be only an opinion, but does not state it as the expression of the opinion of his own, but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation.

*Id.* (quoting *West v. W. Cas. & Sur. Co.,* 846 F.2d 387, 393 (7th Cir.1988) (quoting

*Buttitta v. Lawrence,* 346 Ill. 164, 178 N.E. 390, 393 (1931))) (citations omitted).

 "A plaintiff can establish scienter, or knowledge of the falsity of a material representation, by showing the defendant had actual knowledge of the falsity, possessed reckless disregard for the truth, or falsely stated or implied the representations were based on personal knowledge or investigation." *Schooley v. Orkin Extermination, Co.,* 502 F.3d 759, 766 (8th Cir. 2007).

It is undisputed the statements cited by Plaintiff are found in various MUM recruitment and promotional materials and on MUM's website. These statements contained in materials strategically directed at potential students and their families are seemingly intended to provide them with comprehensive information about MUM upon which they can make informed decisions about whether to attend MUM. The sheer number of references to safety, tranquility, and peace found in MUM's promotional materials and on its website dismisses any notion that those representations were incidental.

The Campus Safety Bulletin—Fall 2002 (Safety Bulletin), for example, indicates MUM students and faculty are required to comply with national, state, and local laws and declares,

> However, *not only is lawful behavior a requirement, but practical and proven techniques for enabling the individual to satisfy this requirement and avoid the self-destructive cycle of short-sighted criminal behavior are provided to all students and ideal administrators.* What we believe to be the first line of defense against crime, the practice of the Transcendental Meditation® and TM–Sidhi® programs, is practiced in groups twice a day by all members of the University community. It is a required, credit-bearing course for all students.

. . . .

> Crime prevention is one of the seven founding goals of the University—"To solve the age-old problem of crime and all behavior that brings unhappiness to the family of man." All students and administrators practice the Transcendental Meditation and TM–Sidhi programs which are designed to effectively eliminate criminal tendencies and behavior at their root cause.

Pl.'s App. 140–41 (emphasis added).

Richard Neate makes a similar declaration in the Comments from Parents brochure cover letter, as follows:

> Dear Parents,

> *In an increasingly uncertain world, it's a great comfort to know that Maharishi University of Management is a safe and nourishing haven for your children.* Many campuses report serious crimes on a daily basis, and binge drinking and recreational drugs pose major problems—but not here.

> How can this be? It's simple, actually. Every student, faculty member, and administrator practices the Transcendental Meditation® technique, which eliminates stress that is the basis of crime and other social problems. As over 600 scientific research studies have shown this technique develops the inner creativity and intelligence of the self, fosters harmonious relationships, and creates *a safe, peaceful environment*

> . . . .

Pl.'s App. 130 (emphasis added).

 These and other representations repeatedly and consistently correlate MUM's curricula and practices with a resultant tranquility and safety on the MUM campus and in its surrounding community. Curriculum and student safety are fundamental factors to be considered in selecting a university; thus, the repre-

sentations are material. MUM's representations regarding crime prevention and the safety of MUM's campus go to MUM's foundational principles (i.e. "Crime prevention is one of the seven founding goals of the University"), and thus a reasonable juror could find these representations are more than mere opinion or puffing. *See Tralon,* 966 F.Supp. at 828 (concluding the plaintiff made a sufficient showing that the trier of fact could find the defendant's statements were not simply expressions of opinion but were factual representations about the performance capabilities of the machine the defendant sold to plaintiff). *But see Midwest Printing, Inc. v. AM Int'l, Inc.,* 108 F.3d 168, 171 (8th Cir.1997) (concluding that representations comparing the efficiency, economy, and quality of one product to other products were "mere expressions of opinion or 'puffing' which are not actionable representations"). MUM's representations are clearly distinct from the representations made in *Cooke v. Allstate Management Corp.,* 741 F.Supp. 1205, 1215–16 (D.S.C.1990), and *Anderson v. Atlanta Committee for the Olympic Games, Inc.,* 261 Ga.App. 895, 584 S.E.2d 16, 21 (Ga.Ct.App.2003), upon which MUM relies.

For instance, in *Cooke* the plaintiff was assaulted in her apartment by an intruder and brought negligence and fraudulent inducement claims against the apartment management agency, alleging she was fraudulently induced into renting the apartment based on the agency's representation that the complex was "safe." *Cooke,* 741 F.Supp. at 1215–16. The court granted summary judgment for the defendants on the plaintiff's fraud claim, reasoning the single remark, "No, it's safe, the apartment complex and for the money it is a really nice place to live, reasonable," was a statement of opinion, not fact, and therefore not actionable as fraud. *Id.* The defendant's single remark in *Cooke* regarding the relative safety of the apartment complex qualified by "for the money," is readily distinguishable from the present case, where MUM repeatedly made unqualified representations promoting the safety of the campus and its surrounding community and attributing its safety to MUM's philosophy and curricula.

In *Anderson,* the court found that general remarks by the Atlanta Committee for the Olympic Games suggesting Atlanta, Georgia, would be "the safest place on earth" during the Olympic Games were "mere expressions of opinion, hope, and expectation" and not actionable as fraud or negligent misrepresentation. *Anderson,* 584 S.E.2d at 21. The committee's safety statements in *Anderson* were general; in fact, there was no indication any committee member ever made the remarks directly to any of the named plaintiffs. In contrast, MUM directed specific representations to the substantially narrower group of prospective students including Levi via the promotional materials for the sole purpose of recruiting Levi and other recruited students to attend the confined structure of a university campus, not to visit a major city.

MUM also argues that the representations made in the Safety Bulletin are statements of policy and intent to perform a future act, and that Plaintiff has not demonstrated by "clear, satisfactory, and convincing evidence" that MUM did not intend to follow those policies at the time MUM promulgated the Safety Bulletin.

The Safety Bulletin set out MUM's policies and procedures for responding to and reporting criminal conduct, assuring (1) MUM would "work closely with state and local police agencies ... who are called on campus to physically detain and arrest individuals if necessary"; (2) "Campus Safety promptly reports all criminal actions to the appropriate state, local, or federal au-

thorities for assistance and/or prosecution"; (3) "Notice of disruptive behavior, when such notice may be a preventative aid, is provided personally to affected students through their dormitory resident advisor or faculty tutor"; (4) "Serious crimes are required to be reported by Maharishi University of Management to the University Community"; and (5) "Ideal administrators are further informed of relevant security procedures." Pl.'s App. 130–36. In search of genuine issues of material fact, the Court must conclude there is evidence in the record that demonstrates MUM consciously deviated from this policy creating a jury question about the falsity of the policy when it was represented to Levi.

▉ Knoles, a MUM student from May 2001 to May 2004, attests in his affidavit to personal knowledge of breaches of MUM's stated safety policies. Specifically, Knoles stated that in 2001, while he was a member of MUM's student government, a MUM student advised MUM administrators that an instructor was harassing her. MUM administrators appointed the student government to deal with the complaint. To Knoles' knowledge, MUM took no further action. Dr. Druhl, a former MUM professor of physics and TM instructor between 1993 and 2000, stated in his sworn affidavit, that during his tenure, "given the corporate culture at [MUM], it would have been inconceivable for me to call police onto campus except through campus security, the Dean's office and in the most extreme circumstances."[7] Pl.'s App. 161–65. These accounts contradict MUM's policy for reporting and dealing with complaints as represented in the Safety Bulletin.

The testimonies of current MUM administrators contradict MUM's claims that MUM enjoyed a "crime-free" campus because of MUM's curricula and practice. For example, when asked whether the attacks on March 1, 2004, were inconsistent with the "Maharishi Effect," MUM President Bevan Morris testified,

> The Maharishi effect research shows a trend of declining crime and other negativity when there are large groups. It's a trend. It's not the elimination of all crime. And [MUM] like any university, like any school, like any business, like any church, any organization, [MUM is] not an island. [MUM is] completely in the midst of the country that [it is] in. And in this country there are 16,000 murders a year and 18 million people who are seriously mentally ill. So the likelihood that [MUM] can be completely free from that influence is— is just not likely. It couldn't be.

Pl.'s App. 49. Similarly, during Neate's deposition, counsel referred to the Safety Bulletin and asked about the guaranty of eliminating crime through the practice of TM. Dr. Neate stated, "It's been proven in a number of studies that if there are [sic] sufficient number of people practice this technology in one location that crime goes down, but elimination, no, nobody is saying that to my knowledge." Pl.'s App. 65. These representations are inconsistent with the declarations made by MUM in the Safety Bulletin and in the Comments from Parents brochure. Moreover, MUM cannot both promote that its policies and curricula produce a safe, peaceful, zero crime haven that makes its campus unique from other universities while simultaneously maintaining that MUM cannot be immune from the crime that is rampant in the world. Plaintiff has met its burden of demonstrating that a genuine issue of ma-

7. The Court accepts for purposes of the pending motion that this evidence can be presented in admissible form at trial, as facts relied upon in resistance by the nonmovant must be admissible at trial, *see* Fed.R.Civ.P. 56(e)(1), but need not be in admissible form when analyzed for summary judgment purposes. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

terial fact exists regarding the falsity of MUM's representations. *See Fong v. All Lots, LLC,* 707 N.W.2d 337, 2005 WL 2756050, at *4 (Iowa Ct.App. Oct.26, 2005) (unpublished table decision) (reversing the district court's grant of summary judgment finding a reasonable juror could conclude that the defendant's representations regarding the sale of property were false when made). Challenges to this evidence and the credibility of these witnesses must be made to and weighed by a jury at trial, not the Court at the summary judgment stage.

The most apparent evidence that MUM did not follow its own safety and crime reporting procedures is, of course, the conduct of MUM administrators following Sem's attack on John Killian. It is undisputed that after the Killian attack, no one from MUM called any law enforcement officials or reported the incident to campus security. Both failures were a breach of MUM's safety policy and procedure. The response to Sem's attack on John Killian was not a single, snap decision by one MUM official. Instead, multiple MUM officials responded similarly in what a jury could find was a deliberate attempt to handle the incident internally rather than pursuant to MUM's stated and disseminated policy.

Considering Knoles' and Dr. Druhl's affidavits along with MUM's response to the Killian attack, a reasonable juror could infer MUM administrators and faculty were resistant to reporting criminal acts. The Court concludes a material question exists that precludes summary judgment because reasonable jurors could differ on whether these statements constitute opinion or fact and whether these statements were false when made. *See Diesel Mach., Inc. v. B.R. Lee Indus., Inc.,* 418 F.3d 820, 832 (8th Cir.2005) ("The basic inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law.") (internal quotation marks omitted).

Following the format of the arguments, the Court defers the further analysis of the elements of justifiable reliance and resulting (causally connected) injury while first addressing the concept of misrepresentation under a negligence theory.

**D. Negligent Misrepresentation**

The elements for the tort of negligent misrepresentation are,

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. (2) ... (T)he liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Barske v. Rockwell Int'l Corp.,* 514 N.W.2d 917, 924 (Iowa 1994); *see also Beeck v. Kapalis,* 302 N.W.2d 90, 96 –97 (Iowa 1981). "In Iowa liability for negligent misrepresentation arises only when the information is provided by persons in the business or profession of supplying information to others." *Boone County Cmty. Credit Union v. Masel,* No. 02–0822, 2003 WL 1050344, at *2 (Iowa Ct.App. Mar.12, 2003) (unpublished table decision). "Absent a special relationship giving rise to a duty of care, a [claimant] cannot establish negli-

gent misrepresentation." *Jensen v. Sattler,* 696 N.W.2d 582, 588 (Iowa 2005). "Thus, when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, we distinguish between those transactions where a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial." *Sain v. Cedar Rapids Cmty. Sch. Dist.,* 626 N.W.2d 115, 124 (Iowa 2001). The requisite duty of care is found against those who are in the profession of supplying information in an advisory, nonadversarial manner, and the supplier of the information knows the recipient of the information intends to rely on the information, and the information is not provided incidental to some other transaction. *See id.* at 126 (finding a high school guidance counselor is a person in the profession of supplying information to others); *Fry v. Mount,* 554 N.W.2d 263, 266 (Iowa 1996) (noting the duty has been applied to accountants and investment brokers); *Ryan v. Kanne,* 170 N.W.2d 395, 402–03 (Iowa 1969) (finding accountants owe a duty of care). Whether a duty of care exists is an issue of law for resolution by the Court. *McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.,* 469 F.Supp.2d 677, 694 (N.D.Iowa 2007) (concluding it is for the court to determine as a matter of law whether the party was in the business of supplying information); *Fry,* 554 N.W.2d at 265 (concluding whether a duty of care exists is always a question of law for the court to decide).

Plaintiff alleges MUM consistently represented to Levi (1) the campus was safe and there was no serious crime on the MUM campus due to the influence of TM, (2) MUM was a violence-free haven in an otherwise troubled world, and (3) MUM devised and implemented campus security policies and procedures that were strictly followed to ensure the safety of students. Plaintiff asserts MUM is liable for negligent misrepresentation by making to Levi the same representations that formed the basis of Plaintiff's fraudulent misrepresentation claim. *See supra* Part II.C.

MUM argues that none of these alleged negligent nondisclosures support an actionable claim of negligent misrepresentation because there is no evidence Levi Butler relied on such representations or that Levi's reliance was the proximate cause of his death.

### 1. Justifiable Reliance

■■■■■ "Reliance is justified when a reasonably careful person would be justified in relying on the information supplied." *Pollmann v. Belle Plaine Livestock Auction, Inc.,* 567 N.W.2d 405, 410 (Iowa 1997); *see also Ceurvorst v. Principal Life Ins. Co.,* 728 N.W.2d 852, 2007 WL 108464, at *3 (Iowa Ct.App. Jan.18, 2007) (unpublished table decision) ("Reliance is not justified if the person receiving the information knows or in the exercise of ordinary care should know that the information is false.").

Of course the only individual who was capable of precisely defining Levi's level of reliance is tragically unavailable to provide this answer. The record does contain Levi's admissions application essay and the testimonies of Levi's family members regarding Levi's stated impressions of and attraction to MUM. Levi's responses to admissions application essay questions [8] in-

---

8. Levi gave the following response to an essay question asking for his personal and professional goals:

It is sometimes hard for me to explain my personal goals to others. *Mine are in an abstract form at the moment. I currently*

*lack the knowledge and experience to crystallize my desire into action.* My goals currently are to learn and experience new things and to take the good that I learn and incorporate it into my daily consciousness. On a much larger time-line I am on a

dicate that at the time he was applying for admission to MUM, Levi had abstract goals, lacked knowledge and experience, and by attending MUM, he sought to gain experience and to incorporate the good he learned into his daily consciousness. Levi said the thing about MUM that he would benefit the most from was the environment in which he would be immersed at MUM, that he would be surrounded by people sincerely dedicated to the principles they believed—principles Levi believed he shared.

Levi's brother, Elijah Butler (Elijah), testified that Levi mentioned the safety of MUM's campus and wanted Elijah to look at MUM's stated claims on MUM's website. During his deposition, Elijah was asked what evidence he had that Levi "bought into [MUM's] claims" that MUM had a safe campus because of MUM's TM and Eastern philosophy. Elijah responded, "Because he enrolled. So, obviously, he believed their Safety Bulletin and their policies. You know, all the selling points, basically." Def.'s App. 78.

Levi's eldest brother, Joshua, testified that Levi

did trust the information that was sent to him talking about that [sic] [MUM was] a safe place, that [MUM] had not had crime in a long period of time. And

that their campus was demonstration—a local demonstration of the Maharishi effect and how the meditation made their campus peaceful because everybody was meditating. Nobody had had any stress, therefore nobody would commit crime. Because their theory is stress is a precursor to crime. So [Levi] trusted that information.

Pl.App. 17. When asked how Joshua knew Levi trusted that information, Joshua stated, "Otherwise he wouldn't have gone there. That's their differentiating factor. I mean, that's their differentiating benefit that they sell. If they didn't have that, they wouldn't have anything. That's what differentiates them from other schools is saying that we preach peace and we demonstrate peace." *Id.*

Levi's mother, Evelyn, testified that, among other things, MUM represented that MUM was a "safe, peaceful environment"; "[TM] techniques are proven effective procedures for eliminating crime"; and "crime prevention is one of the seven founding goals of the university." *Id.* at 14. Evelyn said, "[T]hese were the types of things that our family relied on that made us feel comfortable in sending our precious youngest son to Maharishi University of Management." *Id.* Evelyn was then asked to limit her response to Levi

---

journey of self mastery. Along the way I hope to spread joy and meaning into others lives, to contribute to the growing consciousness of the principles of Unity, and to bring tolerance and understanding to those who need it most.

Def.'s App. 193.

In answering another essay question asking what he wished to gain from his education at MUM, Levi responded as follows:

What I wish to gain from the Maharishi University of Management are tools, relationships, and experiences that will help me to achieve the goals that I stated above. *More than anything I believe that the environment that I will be immersed in will benefit me the most. I have always wished*

to surround myself with people who are sincere and dedicated to the principles that they believe. Principles that I believe that I share with them.* I am also excited about the Sustainable Living program. I've always had a desire to improve the way that people live. For a time I was interested in public education. After I observed more of how it operates I decided that there had to be a better way to affect the lives of others in a way that would bring them peace, prosperity, and happiness. I believe that the Sustainable Living program will give me much versatility and allow me to be creative and original as I grow my professional career.

*Id.* at 193 (emphasis added).

and whether she knew if Levi relied upon that information, and she responded that Levi "expressed on numerous occasions that he was excited about going to a place where peace prevailed." *Id.* When asked whether she understood no place could guarantee complete safety, Evelyn responded, "I understand that accidents can happen. I also understand that universities have a responsibility to follow their own policies and procedures to protect their students. And I assume that that was the case at Maharishi University of Management, especially with the way they presented themselves in their materials." *Id.* at 12. Evelyn was then asked whether she understood that when she sent Levi to a small college where TM was practiced there was still no guarantee that Levi would not be the victim of a violent crime. Evelyn replied,

> What I understood and I still understand is that the risk of being a victim of a violent crime at a university such as MUM is extremely low if the university follows its own safety policies and procedures and does not try to cover up the attack on a student in class and instead reports that attack to the proper authorities.

*Id.* at 12.

As previously discussed, MUM's recruitment materials contained repeated pronouncements regarding the tranquility, security, and lack of crime on the MUM campus and in the surrounding community and were promoted as by-products of MUM's unique curricula. MUM's attempts to draw a bright line between Levi's own reliance on MUM's promotional materials in deciding whether to attend MUM and the joint reliance with his family is unavailing. Plaintiff has presented sufficient evidence to create an inference that Levi's decision to attend MUM was a family, rather than an individual decision. Therefore, asking the Court to equivocally draw a line separating Levi's own reliance

from that of Levi's family, especially here, where Levi's own testimony is unavailable, is at odds with the Court's limited role in that the weight and credibility to be given the evidence is within the province of the jury and not for the Court to decide on a summary judgment motion.

The Court finds a reasonable inference could be drawn from MUM's promotional materials that appear to anticipate prospective student reliance, Levi's admissions application essays, and the testimonies of Levi's family members regarding Levi's state of mind and enthusiasm about MUM's assertions that its campus achieved peace and tranquility through TM, that Levi relied on MUM's safety representations in choosing to attend MUM. Viewing the facts in the light most favorable to the nonmovant, the Court finds Plaintiff presented sufficient evidence that there is a genuine issue of fact for the jury to decide whether Levi relied on the information MUM provided in making his decision to attend MUM.

## 2. Causation

 MUM also argues these statements did not proximately cause Levi Butler's death. "Proximate cause has two components: (1) the defendant's conduct must have in fact caused the damages; and (2) the policy of the law must require the defendant to be legally responsible for them." *City of Cedar Falls v. Cedar Falls Cmty. Sch. Dist.*, 617 N.W.2d 11, 17 (Iowa 2000).

> We assign liability only for injuries "an ordinary person should reasonably foresee as the consequences of the negligent act." *Lawrence v. Grinde*, 534 N.W.2d 414, 422 (Iowa 1995). "If upon looking back from the injury, the connection between the negligence and the injury appears unnatural, unreasonable, and improbable in the light of common

experience, such negligence would be a remote rather than a proximate cause." *Clinkscales v. Nelson Securities, Inc.,* 697 N.W.2d 836, 843 (Iowa 2005). *Warner v. Moore,* 713 N.W.2d 248, 2006 WL 334259, at *1 (Iowa Ct.App. Feb.15, 2006) (unpublished table decision).

If MUM had followed its stated procedures following the attack on John Killian, Sem would have been removed from the campus, and Sem's attack causing Levi's untimely death would never have occurred. Because MUM entices peace-oriented students to its campus, a jury may find it foreseeable that those students, such as Levi, do not exhibit the caution that a student on a university campus that did not promote such unique safety qualities would normally exhibit. Thus, those students who have been lulled into inaction and inattention to possible threats have a higher potential for being victims of criminal attacks if MUM does not follow its own safety procedures. The Court cannot say on a motion for summary judgment that no reasonable juror could find evidence on this record that MUM's representations including its uniquely safe campus and defined safety procedures could have proximately caused Levi's death by lulling Levi into a false sense of security and inattention to the danger on March 1, 2004, when Sem returned to the student population after attacking John Killian. *See Estate of Long v. Broadlawns Med. Ctr.,* 656 N.W.2d 71, 83–84 (Iowa 2002) (concluding the hospital's failure to report the release of the victim's estranged husband from the psychiatric ward as requested by the victim was a proximate cause of the victim subsequently being attacked and killed by the husband even though several intervening events occurred). *But see Murrell v. Mount St. Clare Coll.,* No. 3:00–cv–90204, 2001 WL 1678766, at *6 (S.D.Iowa Sept.10, 2001) (finding that the defendant's failure to accurately report its crime statistics was not the proximate cause of the defendant's injury because neither the defendant nor her father ever personally reviewed the statistics). The causation issue has been strenuously and capably argued but must be evaluated with due recognition that this is a "threshold" determination in which the Court avoids weighing the evidence. *Anderson,* 477 U.S. at 250, 255, 106 S.Ct. 2505.

### E. Negligent Admission or Screening

 Plaintiff asserts MUM breached its duty to current and potential students when it willfully disregarded vital information during Sem's admission process. Levi asserts MUM negligently failed to properly screen Sem before allowing Sem to attend MUM and receive TM instruction. MUM argues this claim fails as a matter of law because there is no cause of action for negligent admission and institutions of higher education have no duty to screen out potentially dangerous applicants for admission.

 "The threshold question in a negligence case is whether the defendant owed a legal duty to the plaintiff." *Tinnian v. Yellow Book USA,* No. 06–2005, 2007 WL 4553643, at *1 (Iowa Ct.App. Dec.28, 2007). "A person normally has no duty to prevent a third person from causing harm to another." *Nellis v. Town of Sutherland,* No. 06–2043, 2007 WL 2004464, at *2 (Iowa Ct.App. July 12, 2007) (unpublished table decision) (citing *Morgan v. Perlowski,* 508 N.W.2d 724, 726 (Iowa 1993); Restatement (Second) of Torts § 315). "However, exceptions to this general rule arise when a special relationship exists between the persons involved." *Id.* "[A] *possessor* of land is subject to liability for physical harm caused to his *invitees.*" *Robinson v. Poured Walls of Iowa, Inc.,* 553 N.W.2d 873, 875 (Iowa 1996) (quoting Restatement (Second) of Torts § 343). Other jurisdictions have applied this prin-

ciple specifically in the context of whether a university owes its students a duty to provide a safe campus.

The general rule is that a landowner has no duty to protect an invitee on the landowner's premises from a third party's criminal attack unless the attack is reasonably foreseeable. Prior similar acts committed upon invitees furnish actual or constructive notice to a landowner. *Relyea v. State,* 385 So.2d 1378, 1382–83 (Fla.Dist.Ct.App.1980). A university owes student tenants the same duty to exercise due care for their protection as a private landowner owes its tenants. *See Peterson v. S.F. Cmty. Coll. Dist.,* 36 Cal.3d 799, 205 Cal.Rptr. 842, 685 P.2d 1193 (Cal.1984). We emphasize that a university is not an insurer of the safety of its students. Nonetheless, university has a duty of reasonable care to protect a student against certain dangers, including criminal actions against a student by another student or a third party if the criminal act is reasonably foreseeable and within the university's control.

*Nero v. Kan. State Univ.,* 253 Kan. 567, 861 P.2d 768, 780 (1993); *see also Sharkey v. Bd. of Regents of Univ. of Neb.,* 260 Neb. 166, 615 N.W.2d 889, 902 (2000) (holding the university owes a landowner-invitee duty to its students "to take reasonable steps to protect against foreseeable acts of violence on its campus and the harm that naturally flows therefrom"); *Brown v. N.C. Wesleyan Coll., Inc.,* 65 N.C.App. 579, 309 S.E.2d 701, 702 (N.C.Ct. App.1983) (applying landowner-invitee analysis to determine whether the defendant college owed a duty to a student who was abducted from campus and subsequently raped and murdered).

 Clearly MUM, as possessor of the property where Levi attended school and where the act of violence against him occurred, owed Levi a duty as an invitee.

Despite MUM's arguments to the contrary, an educational institution can deny admission to a student based on safety concerns surrounding that student's schizophrenia. *See North v. State,* 400 N.W.2d 566, 571 (Iowa 1987) (upholding the trial court's conclusion that the university's denial of readmission to a medical student suffering from schizophrenia, due to safety concerns, was reasonable); *see also Hash v. Univ. of Ky.,* 138 S.W.3d 123, 128 (Ky.Ct.App.2004) ("Clearly, the University was not only concerned for the stabilization of appellant's disability, but also for the safety of its students. If it were not concerned, any harm done by appellant to himself, the faculty, or other students might expose the University 'to legal liability for knowingly permitting such exposure.'" (quoting *Doe v. New York Univ.,* 666 F.2d 761, 777 (2nd Cir. 1981))).

Sem testified at his deposition that during an extensive telephone interview on December 15, 2003, with Leora Rosenberg, an admissions employee for MUM, Sem advised Rosenberg that Sem had been arrested a few times. According to Sem, Rosenberg told Sem, "people have been arrested before and come to [MUM] and it's no big deal." There is no evidence in the record to suggest MUM followed up on this information to investigate the nature of these prior arrests. Sem testified that at least one of his prior arrests involved Sem being taken to a psychiatric hospital. Plaintiff suggests Sem's arrest record indicates Sem had been previously arrested twice for assault caused by his schizophrenia; however, the record is unclear on this fact. Although MUM disputes whether Sem was *ever* arrested, MUM did not uncover this discrepancy until after Levi's murder. Whether at the time he was admitted to MUM Sem *actually* had a previous criminal record or not is not material

to MUM's failure to investigate once Sem disclosed that fact to Rosenberg.

MUM relies on *Ross v. Creighton University,* 957 F.2d 410, 415 (7th Cir.1992), and argues a cause of action for negligent admission cannot be maintained. In *Ross,* the plaintiff filed a lawsuit against the university alleging it negligently recruited and admitted Ross for purposes of participating in the university's basketball program knowing Ross did not meet the university's academic standards, which resulted in Ross being unable to successfully complete his course work and receive a degree. The district court granted the defendant university's motion to dismiss the plaintiff's negligent admission claim, finding that no such claim was sustainable under Illinois law. *Id.* The district court reasoned, "[I]f universities and colleges faced tort liability for admitting an unprepared student, schools would be encouraged to admit only those students who were certain to succeed in the institution. The opportunities of marginal students to receive an education therefore would likely be lessened." *Id.* The Seventh Circuit affirmed, reasoning that the plaintiff's assertion that the university had a duty to admit only students who were "reasonably qualified" would require subjective assessments that were not "open to ready determination in the judicial process." *Id.*

Plaintiff's negligent admissions claim is distinguishable from the claim asserted in *Ross.* Here, Plaintiff alleges that MUM's failure in the screening process was twofold. First, MUM breached a duty to Sem by failing to explore Sem's mental health before allowing Sem to come to the university and participate in TM.[9] Second, by not a giving increased scrutiny to a prospective student who, at a minimum, claimed to have a criminal record, MUM breached a duty to other MUM students, including Levi.

Furthermore, because MUM employs a two-step admission process, it could be inferred that MUM recognizes that not all students are suited for MUM's TM curriculum. MUM students not trained in TM before arriving at MUM must receive TM training and will then be recommended for admission by their TM instructor. MUM's admissions screening process provides MUM with the vehicle to prevent reasonably foreseeable acts of violence by denying admission to individuals who exhibit questionable behavior. However, Plaintiff has raised a fact question as to whether Sem was properly monitored through the admissions process.

MUM also argues that prior to March 1, 2004, Sem never disclosed his mental illness to MUM and that nothing in the record supports another conclusion. MUM specifically points to Sem's visit to Dr. David Sands (Dr. Sands) at the MUM's college health center on January 23, 2004, during Sem's conditional admission period. MUM argues Dr. Sands found no indication of mental health issues. The health center admissions form suggests otherwise. Sem went to see Dr. Sands complaining of an upset stomach, a tense neck, pressure in his head, lack of focus, and spots on his nails. In the personal history section of the admissions form requesting previous illnesses, Sem circled "yes" for both chicken pox and nervous breakdown. Pl.App. 123.

The information obtained from Sem during the admissions screening process goes directly to the heart of the issue of whether it was foreseeable to MUM that Sem posed a danger to himself and other MUM students, including Levi. The Court con-

---

**9.** Dr. Druhl stated in his affidavit that all TM teachers are advised that individuals with psy-

chological problems who practice TM run a significant risk of destablization.

cludes questions of material fact remain as to whether MUM was put on inquiry notice regarding Sem's mental health and prior history of committing violent acts during Sem's admissions process. At this point in the proceedings and under the applicable standard, MUM's motion for partial summary judgment, insofar as it pertains to any claim of negligently screening Sem for admission to MUM, must therefore be denied.

## III. CONCLUSION

For the reasons stated, MUM's Motion for Partial Summary Judgment (Clerk's No. 161) must be **denied,** and MUM's Motion to Strike (Clerk's No. 192) must also be **denied.**

**IT IS SO ORDERED.**